SEALED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2023 MAY 16 PM 3: 52
OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JEFFREY EDWARDS,<br><br>Defendant. | 8:23CR124<br><br>INDICTMENT<br>18 U.S.C. § 1347<br>18 U.S.C. § 1035(a)(2)<br>18 U.S.C. § 2<br>21 U.S.C. § 841(a)(1)<br>18 U.S.C. § 981(a)(1)(C)<br>18 U.S.C. §§ 982(a)(7) & (b)(1)<br>21 U.S.C. §§ 853(a) & (p)<br>28 U.S.C. § 2461(c) |

The United States Attorney charges:

**INTRODUCTION**

At all times material to this indictment:

1. JEFFERY EDWARDS (hereinafter referred to as "EDWARDS") was a Doctor of Medicine, licensed to practice in the State of Nebraska. EDWARDS owned and operated Anesthesia Professionals P.C. d/b/a Medical Pain Relief Clinic ("MPRC"), located in Omaha, Nebraska. EDWARDS asserted that his primary specialty was anesthesiology and secondary specialty was interventional pain management.

2. EDWARDS was an approved Medicare provider since 1993 and an approved Nebraska Medicaid provider since 1993.

3. EDWARDS registered with the Drug Enforcement Administration ("DEA") under the provisions of the Controlled Substances Act as a practitioner and was assigned a DEA registration number. EDWARDS's DEA registration authorized him to write prescriptions for controlled substances on Schedules II through V.

1

4. Beginning on or about 2010, and continuing until on or about February 2019, EDWARDS treated numerous patients at MPRC. During this time period, EDWARDS frequently traveled outside the District of Nebraska.

## Background on Medicare

5. The Medicare program is a federal health benefits program for the elderly and disabled. The Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare program. Generally, Medicare is a health insurance program for people age 65 or older and people under age 65 with certain disabilities. People who receive benefits under these federal programs are referred to as "beneficiaries."

6. Benefits are administered through different parts of the program, referred to as Part A, Part B, Part C, and Part D. Part B covers services provided in an outpatient or clinic setting, and Part D covers prescription drugs. Private companies administer the Part D coverage, and beneficiaries choose a drug plan and pay a monthly premium to the government for that coverage.

7. When a beneficiary has Part D coverage, he or she can take a physician's prescription to a participating pharmacy. The pharmacy will fill the prescription. The beneficiary will pay a co-pay and receive the medication. The pharmacy will then seek reimbursement from the Part D sponsor. The source of the reimbursement is a combination of federal and private funds.

## Background on Medicaid

8. Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid is administered by states, according to the federal requirements. The program is funded jointly by states and the federal government. In order to become a provider in the Medicaid program, the prospective provider must file and have an application accepted by the program.

The Medicaid program reimburses enrolled providers for various health care related services, including prescription drugs, if prescribed in the normal course of medical practice for a legitimate medical purpose by a qualified physician or other health care professional acting within the scope of his/her license.

### Background on Blue Cross Blue Shield of Nebraska

9.  Blue Cross Blue Shield of Nebraska (BCBS Nebraska) is a private insurance company that offers health insurance plans to the federal government, businesses, and private individuals for premiums.

### Background on the Food, Drug, and Cosmetic Act (FDCA)

10. The United States Food and Drug Administration (FDA) is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et.seq. (FDCA). The FDA's responsibilities under the FDCA include regulating the manufacture, labeling, and distribution of all drugs and drug components shipped or received in interstate commerce and foreign commerce. The FDA must approve prescription drugs before the drug can be legally sold, distributed, prescribed, or dispensed in the United States.

11. Botox® is a prescription drug under the FDCA and a biological product under the Public Health Service Act.

### Background on Controlled Substances

12. The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, the DEA regulates certain pharmaceutical drugs designated as "controlled substances" because of their potential for

abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision. *See* 21 U.S.C. § 802(6).

13. The DEA issues registration numbers to qualifying practitioners, including physicians, which permitted them to dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration. 21 U.S.C. § 822.

14. Under the CSA, it is unlawful to distribute or dispense a controlled substance, unless otherwise authorized by law. 21 U.S.C. § 841(a)(l). Except in limited circumstances, Schedule II controlled substances cannot be dispensed without a written prescription. 21 U.S.C. § 829. "A prescription for a controlled substance to be effective must [have] be[en] issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. "The responsibility for the proper prescribing and dispensing of controlled substances is upon the practicing prescriber ...." Id. "An order purporting to be a prescription issued not in the usual course of professional treatment ... [was] not a prescription within the meaning and intent of [S]ection [] 829 .. ..". Id.

## COUNTS I - IX

### (Healthcare Fraud)

15. Paragraphs 1 through 14 of this Indictment are re-alleged and incorporated as if set forth fully herein.

16. Beginning on or about 2010 to on or about February 2019, in the District of Nebraska, EDWARDS did knowingly and willfully devise and intend to devise, execute and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations, and omissions of material

fact, money and property owned by, or under the control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

17. In furtherance of the scheme and artifice, EDWARDS submitted and caused to be submitted to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska claims which the Defendant knew contained materially false and fraudulent pretenses and representations, and omissions of material fact, in that while traveling outside the District of Nebraska, EDWARDS caused and aided and abetted unsupervised, unlicensed, and medically untrained MPRC staff to meet with MPRC patients, review charts with patients, obtain patient vitals, and issue prescriptions for controlled substances to the patients as needed.

18. In furtherance of the scheme and artifice, EDWARDS caused and aided and abetted unsupervised, unlicensed, and medically untrained MPRC staff to engage in a scheme to distribute controlled substances to patients of MPRC outside the usual course of professional practice and without a legitimate medical purpose. Prior to 2011, EDWARDS used a written prescription pad to issue prescriptions for controlled substances to MPRC patients. When EDWARDS traveled and at EDWARDS's direction, unsupervised, unlicensed, and medically untrained MPRC staff continued to meet with MPRC patients and to issue prescriptions for controlled substances. Prior to traveling, EDWARDS would leave with MPRC staff pre-signed blank prescriptions for MPRC staff to issue prescriptions for controlled substances to patients. The number of pre-signed blank prescriptions often depended on how many patients would be seen by MPRC staff when he was out of town.

19. In 2011, EDWARDS began utilizing an electronic health record and e-prescribing transaction hub though a company called Practice Fusion. E-prescribing is accomplished with a dedicated cellular telephone with a "rolling code" on it. EDWARDS kept the cellular telephone

with a "rolling code" at MPRC. This cellular phone would be used to enter the "rolling code" into the Practice Fusion system to send the prescription for controlled substances electronically to a patient's pharmacy. The "rolling code" served as EDWARDS' signature allowing unsupervised, unlicensed, and medically untrained MPRC staff to issue the controlled substance prescriptions under EDWARDS' making it appear he was the one issuing the prescriptions.

20. When EDWARDS traveled and patients were seen by unsupervised, unlicensed, and medically untrained MPRC staff, EDWARDS's cellular phone was used by the unsupervised, unlicensed, and medically untrained MPRC staff. At EDWARDS's direction, the unsupervised, unlicensed, and medically untrained MPRC staff would issue prescriptions for controlled substances to MPRC patients using EDWARDS's DEA number and user identification number. MPRC staff were directed by EDWARDS to enter the "rolling code" into the Practice Fusion system, making it appear that EDWARDS was present and authorized the prescriptions for controlled substances to be issued by a pharmacy.

21. MPRC staff would document the patient visit in the paper medical record and later enter the information into the MPRC electronic healthcare record program (EHR). Staff were directed to use EDWARDS's user identification number in the EHR program making it appear that EDWARDS completed the medical office visit.

22. After a patient visit, EDWARDS caused and aided and abetted MPRC staff to submit healthcare claims to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska for these unsupervised patient visits. The submitted claims falsely represented that MPRC patients received a "nurse" visit, when in fact, as EDWARDS knew, the patients met with unsupervised, unlicensed, and medically untrained MPRC staff.

23. In addition, patients who were issued prescriptions for controlled substances by the unsupervised, unlicensed, and medically untrained MPRC staff caused pharmacies to submit fraudulent claims to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska for unauthorized and issued prescriptions. EDWARDS caused and aided and abetted MPRC staff to write these prescriptions for controlled substances without a legitimate medical purpose and outside the usual course of professional practice, in part, to ensure patients returned to MPRC.

24. In furtherance of the scheme and artifice, EDWARDS also unlawfully used drugs for the treatment of patients that were not federally approved and for which Medicare reimbursement could not be obtained legally, but which were cheaper to buy from unapproved sources, and for which EDWARDS nonetheless fraudulently obtained reimbursement from Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska as though the drugs were federally approved, thereby illegally increasing the profits gotten for EDWARDS than would otherwise be obtained by using and obtaining reimbursement for federally approved drugs.

25. Between 2011 and December 2018, EDWARDS caused and aided and abetted MPRC staff to purchase foreign-sourced Botox® through pharmacies located in Europe. EDWARDS caused MPRC to receive the illegal, foreign Botox through the United States Postal Service and private and commercial interstate carriers. EDWARDS caused MPRC to pay less for illegal, foreign-sourced Botox than the price for legitimate, FDA-approved Botox.

26. On or about August 4, 2017, and September 19, 2017, packages addressed to EDWARDS were taken from the mail-stream by the Department of Homeland Security, Customs and Border Patrol, at the international mail facility located at the Port of Entry, JFK Airport, Jamaica, NY. The packages were mailed from Europe. The packages were intended for

delivery to MPRC. The packages each contained ten (10) packages/vials of foreign-sourced Botox® that was not FDA-approved.

27. On or about August 24, 2017, and September 19, 2017, the FDA sent EDWARDS letters stating the Botox® was not an FDA-approved drug that could be legally sold, distributed, prescribed, or dispensed in the United States. In spite of receiving the FDA notice, EDWARDS continued to direct MPRC staff to purchase and receive in interstate commerce unapproved prescription drugs (specifically, the foreign-sourced Botox®), which prescription drugs were administered to MPRC patients for payment.

28. The foreign-sourced Botox® was misbranded within the meaning of: (a) 21 U.S.C. § 352(f)(1), in that its labeling failed to bear adequate directions for use; and (b) 21 U.S.C. § 353(b)(4)(A), in that it was a prescription drug whose label failed to bear the symbol "Rx only" prior to dispensing. Additionally, the foreign-sourced Botox® had different labeling (such as different warnings) than the Botox® that was FDA approved for the United States market.

29. EDWARDS did not disclose to his patients at MPRC that he was illegally treating them with illegal, foreign-sourced Botox® purchased from foreign distributors.

30. EDWARDS caused MPRC to submit materially false and fraudulent claims for reimbursement to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska, which falsely and fraudulently represented that he had treated MPRC's patients with FDA-approved Botox® drugs legitimately reimbursable by to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska when, in fact and as EDWARDS then knew, he had actually treated the patients with illegal, foreign-sourced Botox®, the cost of which was not reimbursable by to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska.

31. EDWARDS fraudulently caused to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska to pay MPRC for the cost of FDA-approved Botox® when, in fact, MPRC had treated patients with cheaper, non-reimbursable, illegal foreign-sourced Botox®.

### *Loss Due to Fraudulent Claims*

32. While operating MPRC, EDWARDS caused to be submitted fraudulent claims totaling $554,073 to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska. Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska paid on those fraudulent claims as follows:

| Program | Foreign Botox | Payments for Services / Prescriptions | Total Actual Loss |
| --- | --- | --- | --- |
| Medicare Part B | $21,796.92 | $8,069.24 | $29,866.16 |
| Medicare Part C | $1,151.74 | $433.87 | $1,585.61 |
| Medicare Part D | $0.00 | $65,765.89 | $65,765.89 |
| NE Medicaid | $11,750.40 | $49,456.53 | $61,206.93 |
| IA Medicaid | $7,275.59 | $14,343.94 | $21,619.53 |
| BCBS Nebraska | $14,688.16 | $9,222.94 | $23,911.10 |
| **Total** | **$56,662.81** | **$147,292.41** | **$203,955.22** |

### *The Executions of the Scheme*

33. On or about the dates set forth below in the "Approximate Date Claim Submitted" column, in the District of Nebraska, EDWARDS knowingly executed and attempted to execute the scheme and artifice to defraud a health care benefit program in connection with the delivery of and payment for healthcare benefits, items and services, as set forth above, by submitting and causing to be submitted to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska, claims for payment which EDWARDS knew contained materially false and fraudulent

representations, and by injecting illegal, foreign-sourced Botox® into patients, and then submitting fraudulent claims to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska for reimbursement of the purported cost of the treatment drugs and services, in the approximate amounts stated below:

| Count | Patient | Approximate Date Claim Submitted | Type of Claim | Approximate Amount Claimed |
|---|---|---|---|---|
| I | H.P. | February 15, 2018 | Office Visit | $100 |
| II | M.S. | November 19, 2018 | Office Visit | $100 |
| III | A.S. | December 27, 2018 | Office Visit | $100 |
| IV | H.P. | February 15, 2018 | Schedule II Prescription | $6 |
| V | M.S. | November 19, 2018 | Schedule II Prescription | $61 |
| VI | A.S. | December 27, 2018 | Schedule II Prescription | $213 |
| VII | H.P. | June 28, 2018 | Non-FDA-Approved Drug | $4,640 |
| VIII | K.D. | July 30, 2018 | Non-FDA-Approved Drug | $4,640 |
| IX | A.H. | October 18, 2018 | Non-FDA-Approved Drug | $4,640 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS X - XIII

**(Controlled Substances Prescribed Outside the Usual Course of Medical Practice)**

34.    Paragraphs 1 through 4 and 12 through 14 of this Indictment are re-alleged and incorporated as if set forth fully herein.

35. From on or about 2010 through on or about February 2019, in the District of Nebraska, EDWARDS, defendant herein, did knowingly and intentionally cause and aid and abet the distribution of prescriptions for controlled substances that were not for a legitimate purpose in the usual course of medical professional practice.

36. Prior to 2011, EDWARDS used a written prescription pad to issue prescriptions for controlled substances to MPRC patients. When EDWARDS traveled and at EDWARDS's direction, unsupervised, unlicensed, and medically untrained MPRC staff continued to meet with MPRC patients and to issue prescriptions for controlled substances. Prior to traveling, EDWARDS would leave with MPRC staff pre-signed blank prescriptions for MPRC staff to issue prescriptions for controlled substances to patients. The number of pre-signed blank prescriptions often depended on how many patients would be seen by MPRC staff when he was out of town.

37. In 2011, EDWARDS began utilizing an electronic health record and e-prescribing transaction hub though a company called Practice Fusion. E-prescribing is accomplished with a dedicated cellular telephone with a "rolling code" on it. EDWARDS kept the cellular telephone with a "rolling code" at MPRC. This cellular phone would be used to enter the "rolling code" into the Practice Fusion system to send the prescription for controlled substances electronically to a patient's pharmacy. The "rolling code" served as EDWARDS' signature allowing unsupervised, unlicensed, and medically untrained MPRC staff to issue the controlled substance prescriptions under EDWARDS making it appear he was the one issuing the prescriptions.

38. When EDWARDS traveled and patients were seen by unsupervised, unlicensed, and medically untrained MPRC staff, EDWARDS's cellular phone was used by the unsupervised, unlicensed, and medically untrained MPRC staff. At EDWARDS's direction, the

11

unsupervised, unlicensed, and medically untrained MPRC staff would issue prescriptions for controlled substances to MPRC patients using EDWARDS's DEA number and user identification number. MPRC staff were directed by EDWARDS to enter the "rolling code" into the Practice Fusion system, making it appear that EDWARDS was present and authorized the prescriptions for controlled substances to be issued by a pharmacy.

39. Beginning on or about 2010, and continuing until on or about February 2019, EDWARDS knowingly and intentionally caused and aided and abetted unsupervised, unlicensed, and medically untrained MPRC staff to distribute prescriptions for controlled substances that were not for a legitimate purpose in the usual course of medical professional practice. These illegally prescribed controlled substances included, but are not limited to, the following:

| Count | Patient | Approximate Date Prescription Written | Substance Name |
| --- | --- | --- | --- |
| X | H.P. | February 15, 2018 | Hydromorphone HCL & Morphine Sulfate |
| XI | M.S. | November 19, 2018 | Hydrocodone-Acetaminophen |
| XII | R.P. | November 19, 2018 | OxyCONTIN |
| XIII | A.S. | December 27, 2018 | Fentanyl Patch |

All in violation of Title 21, United States Code, Sections 841(a)(1) and 2.

### COUNTS XIV - XVI

### (False Claims)

40. Paragraphs 1 through 14 of this Indictment are re-alleged and incorporated as if set forth fully herein.

41. On or about the date indicated below, in the District of Nebraska, JEFFERY EDWARDS, the defendant, knowingly and willfully caused and aided and abetted unsupervised,

unlicensed, and medically untrained MPRC staff to make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska, health care benefit programs as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035, in that EDWARDS caused and aided and abetted unsupervised, unlicensed, and medically untrained MPRC staff to falsely state and represent on MPRC patient medical records and claims for payment submitted to Medicare, Nebraska Medicaid, Iowa Medicaid, and BCBS Nebraska, that he was the treatment provider on certain dates, when in fact EDWARDS was out of town and the MPRC patient was seen by unsupervised, unlicensed, and medically untrained MPRC staff, when Edwards then and there well knew said statements and representations were false, fictitious, and fraudulent. These were false, fictitious, and fraudulent statements and representations included, but are not limited to, the following:

| Count | Patient | Approximate Date of Offense | False Statement |
|---|---|---|---|
| XIV | H.P. | February 15, 2018 | Treated by Dr. Edwards |
| XV | M.R. | November 8, 2018 | Treated by Dr. Edwards |
| XVI | M.S. | November 19, 2018 | Treated by Dr. Edwards |

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

### FORFEITURE ALLEGATIONS

42.   The allegations contained in Counts I through XVI of the Indictment are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982.

13

43. Upon conviction of one or more violations of Title 18, United States Code, Sections 1347 and 1035, as set forth in Counts I through IX and XIV through XVI of this Indictment, the defendant, JEFFERY EDWARDS, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 18, United States Code, Section 981(a)(l)(C), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

44. Upon conviction of a violation of one or more violations of Title 21, United States Code, Section 841, as alleged in Counts X through XIII of this Indictment, the defendant, JEFFERY EDWARDS, shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses, pursuant to Title 21, United States Code, Section 853(a).

45. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), Title 18, United States Code, Section 982(b)(l), Title 18, United States Code, Section 981(a)(l)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

FOREPERSON

The United States of America requests that trial of this case be held in Omaha, Nebraska, pursuant to the rules of this Court.

DONALD J. KLEINE, #22669
Assistant U.S. Attorney